## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. 17-CR-3246 MV

JOHN DOMPIERRE,

   Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

 **THIS MATTER** is before the Court on the government's Notice of Intent and Motion to Introduce Evidence of Coconspirator Statements Pursuant to FRE 801(d)(2)(E).   Doc. 391. Defense counsel filed a Response [Doc. 394], and both parties filed supplemental briefing [Docs. 475, 476].  The Court held a *James* hearing on October 19, 2021.  Having carefully considered the Motion, relevant law, and being otherwise fully informed, the Court finds that the government's request is well-taken and will be **GRANTED IN PART** as described below.

### BACKGROUND

 Mr. Dompierre is charged in Count 1 with Conspiracy to Commit Transportation for Illegal Sexual Activity, in violation of 18 U.S.C. § 371, and in Count 2 with Transportation for Illegal Sexual Activity and Aiding and Abetting Transportation for Illegal Sexual Activity, in violation of 18 U.S.C. §§ 2421 and 2.  Doc. 381.  Count 1 alleges that:

> Beginning on or about December 12, 2017, and continuing until on or about December 15, 2017, in Bernalillo County, in the District of New Mexico and elsewhere, the defendant, JOHN DOMPIERRE, Camara Cherry-Amos, Chante Bickham, and others known and unknown to the Grand Jury, unlawfully, knowingly and intentionally combined, conspired, confederated, agreed and acted interdependently with each other to commit Transportation for Illegal Sexual Activity, as defined in 18 U.S.C. § 2421.

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the District of New Mexico, and elsewhere:

a. On or about December 12, 2017, Camara Cherry-Amos sent JOHN DOMPIERRE a text message stating "Don't forget to call me."

b. On or about December 13,2017, Camara Cherry-Amos sent JOHN DOMPIERRE a text message stating, "pls jus get our tickets baby so we can see you & I can SEE MY KIDS FINALLY."

c. On or about December 13, 2017, Camara Cherry-Amos attempted to purchase bus tickets with JOHN DOMPIERRE's credit card, but was unsuccessful.

d. On or about December 13, 2017, Canara Cherry-Amos provided JOHN DOMPIERRE with Chante Bickham's Cash App username so that he could send money to Chante Bickham for the purpose of booking bus fare for Camara Cherry-Amos.

e. On or about December 13, 2017, JOHN DOMPIERRE sent $90.00 through Cash App to Chante Bickham to be used to book bus fare for Camara Cherry-Amos.

f. On or about December 13, 2017, Camara Cherry-Amos booked two bus tickets on the Greyhound bus from Albuquerque, New Mexico to Phoenix, Arizona.

g. On or about December 13, 2017, Chante Bickham printed the two tickets, and took them to Camara Cherry-Amos.

h. On or about December 13, 2017, Camara Cherry-Amos advised JOHN DOMPIERRE via text message, "We got our tickets."

i. On or about December 14, 2017, Camara Cherry-Amos traveled with Jane Doe on the Greyhound bus from Albuquerque, New Mexico to Phoenix, Arizona for the purpose of engaging in prostitution.

j. On or about December 15, 2017, JOHN DOMPIERRE solicited a picture of Jane Doe from Camara Cherry-Amos, and Camara Cherry-Amos sent the requested picture.

k. On or about December 15, 2017, JOHN DOMPIERRE transported Camara Cherry-Amos and Jane Doe to his residence in and around Phoenix, Arizona and paid both of them to engage in sexual activity.

Doc. 381 at 1–3.

At Mr. Dompierre's upcoming trial, the government seeks to introduce messages from Ms. Cherry-Amos to Mr. Dompierre, as well as texts between Ms. Cherry-Amos and Ms. Bickham. Doc. 391.   The government argues that these text messages are admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).  *Id.* at 1.  Specifically, the government argues that there was a conspiracy between Mr. Dompierre, Ms. Cherry-Amos, and Ms. Bickham to transport an individual in interstate commerce for the purpose of performing prostitution.  At the October 8, 2021 Pretrial Conference, the government clarified that the individuals allegedly transported as part of this conspiracy included both Camara Cherry-Amos and Jane Doe.

As evidence of the alleged conspiracy, the government points to the text messages themselves, arguing that "any communication that facilitates the booking of the bus ticket . . . is uttered in the course of the conspiracy and furthers the conspiracy by procuring the exact means of transportation."  *Id.* at 5.  Additionally, the government asserts that "Bickham assisted in getting Cherry to the bus station" and that those "communications by Cherry and Bickham further the conspiracy because they facilitate Cherry being physically transported."  *Id.*   Finally, the government argues that statements made by Ms. Cherry-Amos to Mr. Dompierre after the bus trip were also "made to further the conspiracy because they were uttered to effect the intended purpose of the trip: to engage in illicit sexual activity."  *Id.* at 6.  As extrinsic evidence of the conspiracy, the government points to the fact that "[t]he Grand Jury has found probable cause that a conspiracy existed between the defendants."  *Id.* at 4.  Further, the government points to statements that Ms. Cherry-Amos and Ms. Bickham made in plea agreements: Ms. Cherry-Amos admitted that she "arranged for Dompierre to send Bickham $90 to purchase a bus ticket to Phoenix" so that she could "travel there to engage in commercial sex with Dompierre."  *Id.* at 4 (citing Doc. 273 at 7). Ms. Bickham admitted "Cherry arranged to have Dompierre send me $90 so that Cherry could

purchase a bus ticket to Phoenix. I purchased two bus tickets and emailed them to Cherry. I know that Cherry was traveling to Arizona to engage in commercial sex work." Doc. 391 at 4 (citing Doc. 238 at 4).

The text messages that the United States seeks to admit include messages on the first 170 slides of a PowerPoint Presentation presented to the Court as Exhibit 1. Doc. 391 at 2; *see also* Doc. 438 at 1. The first conversation (slides 1–12) is between Ms. Cherry-Amos and Ms. Bickham, and takes place on December 12, 2017; Ms. Cherry-Amos asks Ms. Bickham if she has a printer, then eventually tells her:

> OK so my regular in Arizona is going to pay for my greyhound ticket but I don't
> have an ID so therefore I asked if you had a printer so I can print my ticket out at
> your house and see if you could drop me off at the Greyhound at the time I get it
> but I was going to plan it around your free time as best as I could I'm trying to leave
> tomorrow no later than Thursday

Doc. 391-1 at 5. Ms. Bickham acknowledges Ms. Cherry-Amos' message and tells her that she has a printer and can drop her off "[t]omorrow after 4." *Id.* at 2, 6. Ms. Bickham then asks Ms. Cherry-Amos to contribute "gas," ostensibly in exchange for the ride, and Ms. Cherry-Amos agrees. *Id.* at 9.

The second conversation between Ms. Cherry-Amos and Ms. Bickham (slides 14–24) takes place later on the same day; Ms. Cherry-Amos reaches out to ask whether Ms. Bickham can drop her off at the Greyhound station before 8:30 am on December 14th. *Id.* at 14. Ms. Bickham replies that she cannot, and Ms. Cherry-Amos asks, "What days and time are you free because I need to be out this apartment by the 15th that's when my thing is set so I need to know what days and times you're free so I can schedule my ticket around that time." *Id.* at 20. Ms. Bickham again tells Ms. Cherry-Amos that she is free after 4:00 pm, and Ms. Bickham agrees to Ms. Cherry-Amos's plan to order the tickets on December 13th and have Ms. Bickham print them and bring

them to her.  *Id.* at 23 (text from Ms. Cherry-Amos stating "OK so can I just order them tomorrow and have you print them out and bring to me and then I'll just Lyft to the greyhound" and text from Ms. Bickham stating "Yea").   In the third conversation (slides 25–30), Ms. Cherry-Amos repeatedly texts Ms. Bickham, asking for her email and telling her "I'm bout to send you the money."  *Id.* at 26.

The first conversation between Ms. Cherry-Amos and Mr. Dompierre takes place on December 13, 2017 (slides 32–49).  Eventually, Ms. Cherry-Amos tells Mr. Dompierre "I'm bout to get dress & SEND YU HER TICKET MONEY," and "when ur done with the meeting I need you to book them ASAP love."  *Id.* at 38.  Ms. Cherry-Amos sends Mr. Dompierre a screenshot of her anticipated itinerary and muses about changing her reservation; Mr. Dompierre tells her that he is currently in a meeting.  *Id.* at 44, 47–48.

Ms. Cherry-Amos and Ms. Bickham then have a fourth conversation about the trip (slides 50–59), in which Ms. Cherry-Amos asks Ms. Bickham how to spell her last name; Ms. Bickham tells Ms. Cherry-Amos, "I thought you was just sending it to me" and "I don't want no tickets in my name I'm not gunna be there with you to show ID."  *Id.* at 53, 56, 59.  The messages imply that Ms. Cherry-Amos then calls Mr. Dompierre; when he asks her to call back later, she tells him that she has a woman "OTP," likely short for "on the phone," and that she needs Mr. Dompierre's "card info" because "[s]he was doing the damn payment for us !!!!"  *Id.* at 60–68.

Ms. Cherry-Amos and Ms. Bickham again discuss buying tickets in messages presented on slides 68–120.  Ms. Cherry-Amos tells Ms. Bickham that she will buy the tickets in her sister's name and print them to Ms. Bickham's email; she then tells Ms. Bickham that she needs Ms. Bickham's information to "get my money so I can get me a bus ticket in my name."  *Id.* at 70, 77.  Ms. Bickham tells Ms. Cherry-Amos, "Oh tell him to send it through the cash app," and gives Ms.

Cherry-Amos her username: $chantejanee. *Id.* at 80–88. Eventually, Ms. Cherry-Amos tells Ms. Bickham "[h]e sent it," and Ms. Bickham replies, "Ok I got he sent 90$." *Id.* at 98–99. Ms. Cherry-Amos appears to have difficulty booking the ticket on the Greyhound website, but eventually succeeds and tells Ms. Bickham, "Check your email I just booked it." *Id.* at 107, 111. The conversation ends shortly after Ms. Bickham tells Ms. Cherry-Amos that she will "bring them Ina while," likely referring to the printed tickets *Id.* at 118.

Ms. Cherry-Amos texts Ms. Bickham again the next day: December 14th, when she is scheduled to leave for Phoenix (slides 120–136). The texts chronicle Ms. Bickham picking up some of Ms. Cherry-Amos's belongings to store at her home while Ms. Cherry-Amos is out of town. *Id.* at 121, 131.

Mr. Dompierre and Ms. Cherry-Amos then have a third text conversation (slides 139–170), beginning on December 14, 2017 at 8:31 p.m., when Dompierre asks if Ms. Cherry-Amos has arrived yet. *Id.* at 139. Ms. Cherry-Amos tells him "Not yet not til 2." *Id.* The next day— December 15, 2017, at 3:05 a.m.—Mr. Dompierre suggests meeting at "4." *Id.* at 142. Later, at 10:57 a.m., Mr. Dompierre jokes about the meeting, saying "Looks like a foursome." *Id.* at 143. Shortly thereafter, he asks Ms. Cherry-Amos to send "the pic." *Id.* at 146. In response, Ms. Cherry-Amos sends a picture of Jane Doe. *Id.* at 147. The two then discuss where Mr. Dompierre will meet Ms. Cherry-Amos to give her a ride. *Id.* at 150–170.

At the October 8, 2021 Pretrial Conference, the Court required additional briefing on the issue, and announced its intent to hold a *James* hearing on the admissibility of the text messages. In its supplemental brief, the United States argues that:

> Camara Cherry-Amos is appropriately a co-conspirator to the transport charge. While she was one of the individuals being transported, she did much more than simply consent or acquiesce to the transport. Cherry-Amos organized the trip,

> decided which bus to take, when to leave, she booked the bus tickets and brought
> along another female with help from the defendant and Chante Bickham.

Doc. 475 at 4.  The thrust of this argument is that Ms. Cherry-Amos's high level of involvement in organizing the trip meant that she was the "active or moving spirit in conceiving or carrying out the transportation."  *Gebardi v. United States*, 287 U.S. 112, 118 (1932).  Therefore, the government asserts that Ms. Cherry-Amos could be (1) charged as a co-conspirator *and* (2) considered a co-conspirator for purposes of FRE 801(d)(2)(E).  However, the government also makes an argument in the alternative, asserting that *even if* Ms. Cherry-Amos could not be lawfully charged as a co-conspirator, "[w]hether or not a person can be lawfully charged with conspiracy does not control whether a person is a co-conspirator for the purpose of admitting coconspirator statements under FRE 801(d)(2)(E)."  Doc. 475 at 5.

At the *James* hearing, held on October 19, 2021, the government again emphasized that text messages sent between December 12, 2017 and December 15, 2017 provided evidence of a conspiracy.  *See* Doc. 391-1.  Additionally, the government presented text messages between Ms. Cherry-Amos and Mr. Dompierre after December 15, 2017, arguing that this Court could consider messages sent within a reasonable time after the charged transportation occurred as evidence of Mr. Dompierre's scienter at the time of the transport.  Those text messages are contained within a Cellebrite Report that is currently offered as the government's proposed Trial Exhibit 3.  Doc. 438 at 1.  The government also presented a Greyhound ticket confirmation, reflecting the purchase of one ticket under Camara Cherry-Amos's name for $87.50 and one ticket under the name "Justice Amos" for $70.  That ticket confirmation is currently offered as the government's proposed Trial Exhibit 5.  *Id.*  Finally, the government presented testimony from Deputy Commander Kyle Hartsock, who discussed his involvement investigating the case, his interviews with Ms. Cherry-Amos, Jane Doe, and Ms. Bickham, and the extraction of information from phones owned by Ms.

Cherry-Amos and Jane Doe.  He presented a "location data map" for Jane Doe's phone, constructed using records from AT&T, which showed that Jane Doe's phone crossed the Arizona border at or around 9:17 p.m. on December 14, 2017.  The phone stopped east of Flagstaff at 11:46 p.m. and left Flagstaff at 12:48 a.m. on December 15, 2017.  The phone was just north of Phoenix on December 15, 2017 at 2:32 a.m.

Mr. Dompierre opposes the introduction of the text messages.  He first argues that Ms. Bickham was not a member of the conspiracy, because (1) she was "provided no information as to the purpose of Ms. Cherry-Amos' trip travel to Arizona," and (2) she did not know Mr. Dompierre and had no shared goal with him.  Doc. 394 at 3.  Therefore, the defense asserts, none of Ms. Bickham's text message statements can be admitted; nor can Ms. Cherry-Amos's statements be admitted.  *Id.* at 3–4.  In its supplemental briefing, the defense argues that Ms. Cherry-Amos's actions did not rise to the level necessary to consider her a co-conspirator in a conspiracy to violate the Mann Act.  Doc. 476 at 4.  At the *James* hearing, the defense reiterated its argument as to Ms. Bickham's lack of knowledge, and further argued that (1) the only legally proper victim in a prosecution for conspiracy is Ms. Cherry-Amos, because the defense did not have notice as to the second alleged victim, Jane Doe; (2) there is no evidence that Mr. Dompierre had the intent necessary to be considered part of a conspiracy to transport Jane Doe; and (3) the conspiracy was completed on 9:17 p.m. on December 14, 2017, when Ms. Cherry-Amos and Jane Doe crossed from New Mexico to Arizona, and thus that text messages sent after that time could not be in furtherance of the conspiracy and are irrelevant.

**STANDARD**

**I.      Requirements for the Admission of Co-Conspirator Statements**

A statement is "not hearsay" if it is "offered against an opposing party" and was "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit out-of-court statements by co-conspirators under this rule, the Tenth Circuit has held that the government must demonstrate by a preponderance of the evidence "(1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy." *United States v. Sinclair*, 109 F.3d 1527, 1533 (10th Cir. 1997); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

In determining whether a conspiracy existed, the Court may consider the statements themselves. *United States v. Lopez–Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996). However, the statements alone cannot establish that a conspiracy existed. There must be "some independent evidence linking the defendant to the conspiracy." *Id.* at 1242 (citation omitted). Independent evidence is simply "evidence other than the proffered statements themselves," and such evidence "may be sufficient even when it is not substantial." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987); *Lopez–Gutierrez*, 83 F.3d at 1242 (citation omitted). Indeed, substantial evidence is simply "more than a scintilla. It is such evidence as a reasonable mind would accept as adequate to support a conclusion. [It] is less than the weight of the evidence." *United States v. Petersen*, 611 F.2d 1313, 1331 (10th Cir. 1979). "At a hearing to determine the admissibility of co-conspirator statements, the court is not bound by the rules of evidence in making its determination except those with respect to privileges." *United States v. Baines*, 486 F. Supp. 2d 1288, 1293 (D.N.M. 2007) (citing *Bourjaily*, 483 U.S. at 177–81); *see also United States v. Owens,*

70 F.3d 1118, 1124 (10th Cir. 1995) ("In deciding whether the offering party has satisfied its

burden . . . the district court has the discretion to consider any evidence not subject to a privilege.").

### A.     Determining Whether a Conspiracy Existed

To prove a conspiracy existed, the government must show: "(1) that two or more people

agreed to violate the law, (2) that the defendant knew at least the essential objectives of the

conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the

alleged co-conspirators were interdependent." *United States v. Small,* 423 F.3d 1164, 1182 (10th

Cir. 2005).

The interdependence requirement is often the crux of courts' analysis in deciding whether

a conspiracy exists. "Interdependence is present when each alleged coconspirator . . . depends on

the operation of each link in the chain to achieve the common goal." *United States v. Evans*, 970

F.2d 663, 670 (citation omitted). Interdependence may be proved by showing that an activity

"facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole."

*United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir. 2017) (citation omitted). A defendant

"need not have knowledge of all the details or all the members of the conspiracy and may play

only a minor role in the conspiracy." *Small,* 423 F.3d at 1182. In a "hub-and-spoke" conspiracy,

for example, "spokes" are members of the conspiracy who do not know each other but are

connected by one central "hub." *See Evans*, 970 F.2d at 670.

> [A] single conspiracy does not exist solely because many individuals deal with a
> common central player. What is required is a *shared,* single criminal objective, not
> just similar or parallel objectives between similarly situated people . . . Separate
> spokes meeting at a common center constitute a wheel conspiracy only if those
> spokes are enclosed by a *rim*.

*Id.* at 670–71 (citation omitted) (emphasis in original). The *Evans* Court explained that, for

example, competitors in contact with each other while selling drugs in the same area would not be

part of the same conspiracy: "[w]hat is needed is proof that they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Id.* at 71 (emphasis in original). "Interdependence can be established by circumstantial evidence alone, and a single act can be sufficient to demonstrate interdependence." *Pickel*, 863 F.3d at 1253.

### B.      Determining Membership in the Conspiracy

Once the existence of a conspiracy is found, the Court must determine that the declarant and the defendant were both members of the conspiracy. Here, the government argues that Ms. Cherry-Amos, one of the declarants, was a member of conspiracy to transport herself. That argument implicates two seminal Supreme Court cases: *United States v. Holte*, 236 U.S. 140 (1915), and *Gebardi v. United States*, 287 U.S. 112, 118 (1932).

In *Holte*, the indictment charged a conspiracy between the female defendant, Holte, and a man named Laudenschleger, "that Laudenschleger should cause the defendant to be transported from Illinois to Wisconsin for the purpose of prostitution." *Holte*, 236 U.S. at 144. The district court ruled that "although the offense could not be committed without her, [Holte] was no party to it, but only the victim." *Id.* In contrast, the Supreme Court reasoned that, "it would be going too far to say that the defendant could not be guilty in this case," and found "little reason for not treating the preliminary agreement as a conspiracy that the law can reach, if we abandon the illusion that the woman always is the victim." *Id.* at 145. Indeed, the Court suggested that one think about "a professional prostitute, as well able to look out for herself as was the man," who "suggest[ed] and carr[ied] out a journey . . . in the hope of black-mailing the man," and who bought rail tickets to do so. *Id.* The Court saw no reason that such a woman should not be criminally liable under the Mann Act.

Seventeen years later, the Supreme Court decided *Gebardi*, in which a man and a woman were indicted for conspiring to transport the woman from one state to another for the purpose of engaging in sexual intercourse with the man. *Gebardi*, 287 U.S. at 115–16. "At the trial without a jury there was evidence . . . that the man purchased the railway tickets for both petitioners for at least one journey; and that in each instance the woman, in advance of the purchase of the tickets, consented to go on the journey." *Id.* at 116. The Court ruled that the woman could not be charged with conspiracy to violate the Mann Act. The Court was careful to distinguish *Holte*, stating "[t]hose exceptional circumstances envisaged in *United States v. Holte* . . . are clearly not present here. There is no evidence that [the woman] purchased the railroad tickets or that hers was the active or moving spirit in conceiving or carrying out the transportation. The proof shows no more than that she went willingly upon the journeys for the purposes alleged." *Id.* at 117. The Court reasoned that mere consent to proceed on a journey across state lines for the purpose of engaging in sexual intercourse was not chargeable criminal conduct. "Congress set out in the Mann Act to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation," and yet did not choose to criminalize that conduct as part of the statute. *Id.* at 121. "We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together . . . [a woman's consent to transport] was not automatically to be made punishable under the [conspiracy statute]." *Id.* at 121.

A First Circuit case, *United States v. Footman*, helpfully summarizes the policy rationale that drove the Court's decision in *Gebardi*: "There is an inherent policy judgment in the Mann Act not to prosecute women who do no more than consent to being transported across state lines for the purpose of prostitution. But that policy simply does not apply when the women assume roles in running the business." 215 F.3d 145, 151 (1st Cir. 2000). *Footman* cites two cases in which

Mann Act-related conspiracy convictions were upheld because the charged woman played a sufficiently active role in the conspiracy.  The first case is *United States v. Sabatino*, in which the First Circuit "upheld the conspiracy conviction of a wife who played an active role in two prostitution businesses her husband ran." *Footman*, 215 F.3d at 151 (citing *Sabatino*, 943 F.2d 943, 97–98 (1st Cir. 1991)).  The second is *United States v. Anderson*, which affirmed the "conviction of an adult prostitute for transporting a minor where the adult prostitute's car was used in transportation and where the adult prostitute purchased a train ticket for the minor." *Footman*, 215 F.3d at 151 (citing 139 F.3d 291, 295–96, 298–99 (1st Cir.1998)).

The government asserts that whether a person can be lawfully charged with conspiracy does not control whether a person is a co-conspirator for the purpose of admitting co-conspirator statements under FRE 801(d)(2)(E).  Neither party has cited binding case law on this point, and this Court has found none.  However, it is worth noting that this Court has previously distinguished between evidentiary co-conspirators and charged co-conspirators.  *See Baines*, 486 F.Supp.2d at 1295 ("The Tenth Circuit has held that '[t]he co-conspirator hearsay exception contains no requirement that the declarant be a defendant, only that she be a member of the conspiracy.'") (citing *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1072 n.5 (10th Cir. 2006)).

## C. Determining Whether Statements Were Made During and in Furtherance of the Conspiracy

"A coconspirator statement is made 'during the course' of the conspiracy if it is made before 'the objectives of the conspiracy have either failed or been achieved.'" *Owens*, 70 F.3d at 1126 (10th Cir. 1995) (quoting *United States v. Perez,* 989 F.2d 1574, 1579 (10th Cir.1993)). "The termination of the conspiracy need not coincide with the completion of the crime  . . . . The time when a continuing conspiracy terminates depends upon the particular facts and purposes of such conspiracy." *Cleaver v. United States*, 238 F.2d 766, 769 (10th Cir. 1956); *cf. United States*

*v. Jimenez Recio*, 537 U.S. 270, 276 (2003) ("the American Law Institute's Model Penal Code §5.03 . . . would find that a conspiracy 'terminates when the crime or crimes that are its object are committed'").

In addition to assessing whether a statement was made "during" a conspiracy, this Court must assess whether each statement made was "in furtherance" of the conspiracy. Notably, the Tenth Circuit has rejected the "proposition that the statements must *actually* further the conspiracy to be admissible," deciding that it is enough that a statement is "intended to promote the conspiratorial objectives"—it need not actually have the effect of moving the conspiracy forward. *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).

> Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members."

*United States v. Bhula*, No. 1:19-CR-01631 KWR, 2021 WL 4355600, at *4 (D.N.M. Sept. 24, 2021).

## DISCUSSION

In this case, the government argues that there was a conspiracy between Mr. Dompierre, Ms. Cherry-Amos, and Ms. Bickham to transport both Ms. Cherry-Amos and Jane Doe in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2421. That statute states:

> Whoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 2421(a).   To introduce Ms. Cherry-Amos and Ms. Bickhams' co-conspirator statements, then, the government must show by a preponderance of the evidence that Mr. Dompierre knew that at least one of these two women was travelling in interstate commerce for the purpose of prostitution.  "An essential constituent element of offense is an intent and purpose on the part of the accused that the female transported in interstate commerce shall engage in such immoral conduct."  *Dunn v. United States*, 190 F.2d 496, 497 (10th Cir. 1951).

The government argues that the text messages between Mr. Dompierre and Ms. Cherry-Amos make clear that Ms. Cherry-Amos was traveling with another person.  The Court agrees. *See, e.g.*, Doc. 391-1 at 38 (December 13, 2017 texts from Ms. Cherry-Amos to Mr. Dompierre stating "I'm bout to get dress & SEND YU *HER* TICKET MONEY," and  "when ur done with the meeting I need you to book *them* ASAP love") (emphasis added).

However, the Court does not agree that a preponderance of the evidence supports the government's argument that Mr. Dompierre knew that Jane Doe was traveling to Arizona for the purpose of prostitution.  There was nothing in the text messages to indicate that Mr. Dompierre knew of Jane Doe's purpose for traveling until December 15, 2017, when Mr. Dompierre asks Ms. Cherry-Amos to send "the pic" and Ms. Cherry-Amos responds with a picture of Jane Doe.  Doc. 391-1 at 147.  That text exchange is certainly suggestive, and suggests that by December 15 around 11:05 a.m. Mr. Dompierre had received information that Jane Doe was interested in joining Ms. Cherry-Amos for a "session" with Mr. Dompierre.  However, the government presented no evidence regarding *when* exactly Mr. Dompierre gained such knowledge.  That failure is fatal to the government's theory that there existed a conspiracy to transport Jane Doe in interstate commerce for purposes of prostitution.  In a conspiracy prosecution, "[c]ompletion of the object of the conspiracy completes the conspiracy."  *Cleaver*, 238 F.2d 766, 769 (10th Cir. 1956).  As the

15

alleged conspiracy is to violate 18 U.S.C. § 2421, this Court looks to the case law regarding substantive transportation offenses. "Unlawful transportation," not prostitution itself, "is the gist of the offense." *Robinson v. United States*, 143 F.2d 276, 278 (10th Cir. 1944). Where the prohibited transportation is a "single, continuous act," the offense "[is] completed when the transportation crosse[s] the state line." *Id.*; *see also DeVault v. United States*, 338 F.2d 179, 182 (10th Cir. 1964) (citing *Mortensen v. United States*, 322 U.S. 369, 64 (1944) ("The intention to engage in the immoral purposes must be found to exist before the conclusion of the interstate journey.")). It is reasonable to infer from Jane Doe's phone data that she and Ms. Cherry-Amos crossed the border between Arizona and New Mexico at or around 9:17 p.m. on December 14, 2017. The Court cannot conclude that a preponderance of the evidence showed that Mr. Dompierre was aware that Jane Doe was traveling for the purpose of prostitution at the time she crossed the border. Jane Doe and Ms. Cherry-Amos arrived in Phoenix at or around 2:32 a.m. on December 15, 2017. They then left the bus, completing their transportation, and spent the night at a location close to South 16th Street and East Roeser Road. *See* Doc. 391-1 at 157. The Court cannot conclude that a preponderance of the evidence showed that Mr. Dompierre was aware that Jane Doe was traveling for the purpose of prostitution at the time she left the bus with Ms. Cherry-Amos.

The government did, however, successfully establish that a conspiracy existed to transport Ms. Cherry-Amos in interstate commerce. As noted above, Mann Act victim cannot be charged as a co-conspirator in a conspiracy to violate that Act unless she is the "active or moving spirit in conceiving or carrying out the transportation." *Gebardi*, 287 U.S. at 118. Here, Ms. Cherry-Amos's actions demonstrate that she was the active or moving spirit in conceiving of the transportation. Ms. Cherry-Amos decided which Greyhound bus to take and when, initiating

contact with Mr. Dompierre and Ms. Bickham to effectuate her plan.  She was the person who ultimately booked the tickets through Greyhound's website.  This evidence is enough to conclude that she did more than merely consent to the transportation.  Thus, she could be charged as a co-conspirator and may also be considered a co-conspirator for evidentiary purposes.

A preponderance of the evidence also supports the conclusion that Ms. Bickham was aware of the Ms. Cherry-Amos's travel and the purpose of that travel.  Ms. Bickham's plea agreement indicates that "Camara Cherry-Amos is a prostitute I know."  Doc. 283 at 4.  Deputy Commander Hartsock also testified that in post-arrest interviews with law enforcement, Ms. Bickham stated that she was aware that Ms. Cherry-Amos was a sex worker.  Given Ms. Bickham's awareness of this fact, one can infer that, when Ms. Cherry-Amos told Ms. Bickham "Ok so my regular in Arizona is going to pay for my greyhound ticket," Ms. Bickham knew this meant "regular customer."  Doc. 391-1 at 5.  If a regular customer was paying for Ms. Cherry-Amos's Greyhound ticket, and Ms. Bickham was aware of that fact, it is reasonable to infer that Ms. Bickham knew that Ms. Cherry-Amos was likely to be traveling for the purpose of engaging in commercial sex with that regular.  Indeed, Ms. Bickham's plea agreement reflects such knowledge; she states, "I knew that Cherry was traveling to Arizona to engage in commercial sex work in violation of Arizona law, and I transported Cherry in interstate commerce for this purpose by buying her a bus ticket to Phoenix."  *Id.* at 4.

Likewise, a preponderance of the evidence indicates that Mr. Dompierre was aware of Ms. Cherry-Amos's purpose in traveling to Arizona.  Ms. Cherry-Amos admits in her plea agreement that Mr. Dompierre was one of her regular "Johns," a regular customer.  Doc. 273 at 7.  Thus, Mr. Dompierre was aware that Ms. Cherry-Amos was a sex worker.  In *United States v. Wheeler*, the

Tenth Circuit considered a case in which a defendant who knew that the four women he transported

from Spokane to Salt Lake City were prostitutes, and reasoned:

> A person is presumed to intend the natural consequences of his acts.  If the jury
> found, as it did, that [the defendant] knew the four women were practicing
> prostitutes and that he transported them interstate, then the natural consequence of
> his action would be that they would engage in prostitution after their arrival, which
> they did.

444 F.2d 385, 388 (10th Cir. 1971).  Thus, Mr. Dompierre's awareness of Ms. Cherry-Amos's

profession weighs heavily in the Court's consideration of whether he had knowledge of her

purpose to engage in prostitution in Arizona.  As the government pointed out at the *James* hearing,

*Wheeler* also states that a defendant's purpose in effecting transport "may be proved by

circumstantial evidence, with consideration being given to the conduct of the parties within a

reasonable time before and after the transportation."  *Wheeler*, 444 F.2d at 387.  This is in some

tension with the Supreme Court's holding that "[t]he intention to engage in the immoral purposes

must be found to exist before the conclusion of the interstate journey."  *Mortensen*, 322 U.S. at 64.

Here, the evidence shows that Ms. Cherry-Amos and Jane Doe engaged in sexual intercourse with

Mr. Dompierre after their interstate journey.[1]  With respect to Jane Doe, this is the only evidence

that the Court finds bears upon Mr. Dompierre's knowledge of Jane Doe's reason for travel; as

stated above, the Court declines to conclude that this fact amounts to a preponderance of the

evidence.  With regard to Ms. Cherry-Amos, however, the Court considers this fact and concludes

---

[1] This conclusion is supported by text messages between Ms. Cherry-Amos and Mr. Dompierre.  Doc. 391-1 at 244 (December 24, 2017 text message from Mr. Dompierre, stating, "I gave you $230 and you've only seen me once.").  This conclusion is also supported by testimony from Deputy Commander Hartsock, who stated that during his interviews with Jane Doe he confirmed that she and Ms. Cherry-Amos were each paid $200 for having sex with a Mr. Dompierre in Phoenix.

that, in conjunction with the other evidence presented, the government has met its burden in

proving Mr. Dompierre's knowledge of Ms. Cherry-Amos's purpose in traveling to Arizona.[2]

Thus, the Court has concluded "(1) that two or more people agreed to violate the law, (2)

that the defendant knew at least the essential objectives of the conspiracy, [and] (3) that the

defendant knowingly and voluntarily became a part of it."  *Small,* 423 F.3d at 1182.  The Court

additionally concludes that the alleged co-conspirators—Mr. Dompierre, Ms. Bickham, and Ms.

Cherry-Amos—were interdependent.  *Id.*  Interdependence may be proved by showing that an

activity "facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a

whole," and "a single act can be sufficient to demonstrate interdependence."  *Pickel*, 863 F.3d at

1252–53.   Here, Mr. Dompierre sent $90 to Ms. Bickham with the intent to pay for Ms. Cherry-

Amos's Greyhound ticket.[3]   That action links Ms. Bickham and Mr. Dompierre together and

facilitated the venture as a whole.

The government has therefore demonstrated that a conspiracy existed and that Mr.

Dompierre, Ms. Bickham, and Ms. Cherry-Amos were members of that conspiracy.  *Sinclair*, 109

F.3d at 1533.  This Court also concludes that the statements that the government seeks to admit

between December 12, 2017 at 10:09:01 a.m. and December 14, 2017 at 9:17 p.m. were made in

the course of the conspiracy.  Notably, this includes only messages displayed on slides 1 to 138 of

Exhibit 1, not the full 170 slides that the government seeks to admit.  Where transportation

---

[2] Defense counsel also argued in its briefing before the *James* hearing that Count 1 of the Indictment—the conspiracy charge—should be dismissed; "Ms. Cherry-Amos is not a co-conspirator in this matter . . . . As a result, Mr. Dompierre cannot be charged with the conspiracy and count one of the indictment must be dismissed."  Doc. 476 at 5.  As the Court has found Ms. Cherry-Amos is a co-conspirator, the indictment will not be dismissed.

[3] This conclusion is supported by Ms. Cherry-Amos's plea agreement, which states "I arranged for Dompierre to send Bickham $90 to purchase a bus ticket ot Phoenix so that I could travel there to engage in commercial sex with Dompierre."  Doc. 273 at 7; *see also* Doc. 391-1 at 73–101. (text message conversation between Ms. Cherry-Amos and Ms. Bickham regarding the transfer of money from Mr. Dompierre).

prohibited by the Mann Act is a "single, continuous act," as it was here, the offense "[is] completed when the transportation crosse[s] the state line." *Robinson*, 143 F.2d at 278.  The conspiracy was therefore completed on December 14, 2017 at or around 9:17 p.m.; and statements made after that point in time are therefore not made "during" the conspiracy or "in furtherance" of it.  Otherwise, however, the messages on the first 138 slides that the government seeks to admit are in furtherance of the conspiracy.   Each individual message facilitated Ms. Cherry-Amos's travel: her communications with others ensured that she was able to purchase bus tickets, had a ride to the Greyhound station, had a safe place to store her belongings during the trip, and so on.  *Supra* at 4–6.  Slides 1 to 138 of Exhibit 1 are therefore admissible under FRE 801(d)(2)(E).  Defense counsel's objections to the introduction of these slides, detailed on Defense's Exhibit A and B, are therefore overruled.  The objection noted on Defense's Exhibit C—that text messages made after December 15, 2017 should not be admitted under FRE 801(d)(2)(E)—is sustained.[4]

The government indicated at the *James* hearing that it may seek to admit some of the text messages under an exception to the hearsay prohibition other than FRE 801(d)(2)(E).  The defense argued that text messages sent after 9:17 p.m. on December 14, 2017 are irrelevant regardless of whether the government is able to overcome the hearsay prohibition.  *See also* Doc. 477 at 6–7 (arguing that text messages sent after December 15, 2017 are irrelevant).  Thus, the Court finds it appropriate to address defense counsel's objections under Rules 401 and 403.

The Court finds that these text messages are relevant under Rule 401, as they speak to Mr. Dompierre's intent in affecting Ms. Cherry-Amos's transport.  *See Wheeler*, 444 F.2d at 387 (A

---

[4] Given the Court's exclusion of text messages made after December 14, 2017 at or around 9:17 p.m. under FRE 801(d)(2)(E), the Court need not reach defense counsel's objection related to Exhibits D and E—that the government did not seek to introduce several messages sent between December 17, 2017 and December 26, 2017.  *See* Doc. 477 at 7.

defendant's purpose in affecting transport "may be proved by circumstantial evidence, with consideration being given to the conduct of the parties within a reasonable time before and after the transportation."). However, the vast majority of these messages are likely to be found to be substantially more prejudicial than probative. Fed. R. Evid. 403. They discuss how Mr. Dompierre picked up Ms. Cherry-Amos and had commercial sex with her. *See, e.g.*, Doc. 391-1 at 244; Def. Ex. C at 2. They also discuss potential future commercial sex sessions. *See, e.g.*, Doc. 391-1 at 184. This evidence is highly inflammatory and is likely to prejudice the jury against Mr. Dompierre for engaging in commercial sex—an act that he is not charged with. If the government overcomes the hearsay probation, the Court is therefore likely to find many of these messages inadmissible under Rule 403.

At this time, then, messages displayed on slides 1 to 138 of Exhibit 1 are admissible under FRE 801(d)(2)(E). Both parties may present further arguments on the admissibility of other text messages at the October 27, 2021 Pretrial Conference, or at trial.

Finally, the Court finds it appropriate to address several other arguments made by the parties in their briefs on the admissibility of the text messages. First is defense counsel's argument that Mr. Dompierre did not have notice that the government was proceeding on a theory that he conspired to transport Jane Doe as well as Ms. Cherry-Amos. That argument is fruitless; Count 1 listed overt acts describing Jane Doe's travel to Arizona and therefore gave defense counsel sufficient notice. Doc. 380 at 2. Further, the Court concludes that Count 2 of the indictment—the substantive transportation count—was properly charged, and that the government may proceed on the theory that Ms. Cherry-Amos and/or Jane Doe was actually transported interstate for the purpose of prostitution. *See* Doc. 475 at 79 (government briefing describing the appropriate "unit of prosecution" for a Mann Act transportation charge); *Bell v. United States*, 349 U.S. 81, 83–84

(1955).  Given this finding, the Court concludes that not all reference to Jane Doe at trial will be irrelevant.  *See* Doc. 476 at 5–7 ("The defense moves this Court to find that any evidence as to Jane Doe is irrelevant and inadmissible.").  The Court understands the defense's concern that testimony as to Jane Doe will be based on hearsay and that the introduction of testimonial statements may violate Mr. Dompierre's Confrontation Clause rights.  *Id.* at 6.  However, this Court has not yet seen any indication that a testimonial statement from Jane Doe will be introduced at trial.  Likewise, the Court will be in a better position to rule on a hearsay objection at trial.  Therefore, the Court will deny this portion of defense counsel's argument without prejudice. Defense counsel may re-raise these concerns at trial if necessary.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the government's Notice of Intent and Motion to Introduce Evidence of Coconspirator Statements Pursuant to FRE 801(d)(2)(E) is **GRANTED IN PART**.  Messages on slides 1 to 138 of Exhibit 1 are admissible under FRE 801(d)(2)(E).

ENTERED this 23rd day of October 2021.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE